IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| CARA APPLEGATE, | ) | C/A 2:12-738-RMG-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| KIAWAH DEVELOPMENT PARTNERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff, a former employee of the Defendant,
asserting claims for interference with, and retaliation for exercising her rights under, the Family and
Medical Leave Act of 1993, 29 U.S.C. § 2601m *et seq.* ("FMLA"). The Defendant filed a motion
for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on February 1, 2012. Plaintiff filed a
memorandum in opposition to the Defendant's motion on February 14, 2012, following which the
Defendant filed a reply memorandum on February 25, 2012. A hearing was held on May 1, 2013 at
which both sides were represented by able counsel. Defendant's motion is now before the Court for
disposition.[1]

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for
all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local
Rule 73.02(B)(2)(g), D.S.C. The Defendant has filed a motion for summary judgment. As this is a
dispositive motion, this Report and Recommendation is entered for review by the Court.



1

## **Background and Evidence**[2]

Defendant is a local, family owned business that develops residential-resort golf communities and is run by its Chairman and Chief Executive Officer, Charles P. "Buddy" Darby. See Plaintiff's Exhibit 1; Plaintiff's Deposition, p. 205; B. Darby Deposition, pp. 5, 61; B. Darby Affidavit, ¶¶ 2-3. The majority owners of the Defendant are Buddy Darby and his four siblings: John Darby, Beth Haizlip, Anne Parker and Joya Wolf (the "Darby Siblings"). See B. Darby Affidavit, ¶ 3.

Plaintiff was hired by the Defendant in November 2002 as the Defendant's financial manager. Although Plaintiff was an employee of the Defendant, the Darby siblings reimbursed the Defendant the entire cost of Plaintiff's salary, as her job was to assist the five Darby siblings with their personal finances by performing such tasks as paying their bills, handling their bank accounts, and assembling information for their tax returns. See Plaintiff's Deposition, pp. 20-22; Parker Deposition, pp. 7-8, 19-20; Darby Deposition, pp. 31-32, 37-, 54-55, 58-59. Plaintiff had responsibility not only for the Darby family, but also their spouses, children and their limited partnerships.; see Plaintiff's Deposition, pp. 22-25, 32; and her job responsibilities included paying bills; acting as a liaison between lawyers, bankers, creditors and insurance agents in regard to loans, purchases and other transactions; keeping ledgers on all the Darby family accounts; paying credit cards; reconciling bank statements; providing personal financial information to accountants for the preparation of annual tax returns; monitoring the Darby family investments; developing household budgets; serving as a co-trustee on certain family trust accounts; and serving as the primary signatory

---

[2]The facts and evidence are considered and discussed hereinabove in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).



on their bank accounts.  Plaintiff's Deposition, pp. 20-37, 61-62.  See also Defendant's Exhibit C (November 30, 2009 Job Description).  In this position, Plaintiff had access to highly confidential and sensitive personal financial information of the Darby family, and had responsibility over more than 140 family investment and bank accounts as well as power of attorney on most of the Darby family accounts.  See Plaintiff's Deposition, pp. 21, 29, 32-33.

Plaintiff's initial salary when she was hired was $40,000.  See Plaintiff's Deposition, Exhibit 2; Plaintiff's Exhibit 9.  Buddy Darby was Plaintiff's supervisor, and he had the responsibility and authority for determining whether Plaintiff continued in her position.  See Defendant's Exhibit C; B. Darby Deposition, pp. 5-6, 69; Darby Declaration, ¶ 4; Plaintiff's Deposition, p.53.

Under the FMLA, qualified employees are entitled to twelve (12) weeks leave for family and health matters.  Plaintiff became pregnant and was approved for FMLA leave in 2008, following which she was restored to her job upon return from her leave.  See Plaintiff's Deposition, pp. 193, 207.  Prior to her first FMLA leave in 2008,  Buddy Darby hosted a baby shower for Plaintiff in July 2008.  He also authorized payment of the costs of the shower of over $5,000.00.  See Bayse Affidavit, ¶¶ 3-4; Plaintiff's Deposition, p. 188.  Additionally, although at the time of her leave in 2008 Plaintiff only had six (6) weeks of accrued vacation time, Plaintiff requested, and Buddy Darby arranged, for her to be paid an additional six weeks so that she would be paid for  her entire twelve (12) week FMLA leave period.  See Plaintiff's Deposition, pp. 196-197, 200-201, 206. While Plaintiff was on her FMLA leave in 2008, Jill Moss covered Plaintiff's work duties.  Among the material Plaintiff provided Moss was a notebook which contained highly confidential family



information.  See Plaintiff's Deposition, pp. 176-177, 353.[3]

When Plaintiff returned from her FMLA leave in late November 2008, she requested a modified work schedule so she could spend more time at home with her child.  See Plaintiff's Deposition, pp. 207, 209-211.  Plaintiff asked Buddy Darby if she could be permitted to work "in the office half the time [and] out of the office the other half," and Darby agreed to this request.  Plaintiff was allowed to work a modified schedule throughout the remainder of her employment.  See Plaintiff's Deposition, pp. 209-213.

Buddy Darby also encouraged and paid for Plaintiff to obtain a master's degree in business administration while she was employed by the Defendant.  See B. Darby Deposition, p. 52.  After Plaintiff received her master's degree, she requested an increase in salary, and Buddy Darby's brother, John Darby, worked with Plaintiff to determine the amount of salary increase.  See B. Darby Deposition, pp. 52-53.  The Darby siblings decided that Plaintiff would receive a $10,000 increase in her salary, for a new annual salary of $60,000 paid by the Defendant (which would continue to be reimbursed by the Darby siblings).  Plaintiff was also to receive an additional $20,000 annual "incentive service fee," which was paid directly to the Plaintiff by each of the five Darby siblings (pro rata) individually,[4] for a total compensation package of $80,000 annually.  B. Darby Deposition, pp. 53-54; Plaintiff's Exhibit 5 (Employment Agreement); Plaintiff's Exhibit 10.  All of the five siblings, except for Joya Wolf, gave Plaintiff permission to write their checks for her monthly

---

[3]The notebook was divided into sections and passwords for each family member's accounts, which were listed on tabs.  See Plaintiff's Deposition, p. 178.

[4]Seventy-five percent (75%) of the $20,000 was to be paid on a monthly basis, one-fifth coming from each sibling, with the remainder of the balance to be paid to Plaintiff at the end of the year, provided that she was actively employed by the Defendant when the payment was due.  See Plaintiff's Exhibit 5.



incentive service fee, which Plaintiff did throughout 2010. See Plaintiff's Exhibit 12. Additionally, although Plaintiff's employment agreement was not signed by the parties until the end of March 2010, the additional $30,000 in wages and incentive service fee was paid to Plaintiff retroactively starting as of January 1, 2010.  See Plaintiff's Exhibit 5 (Employment Agreement); B. Darby Deposition, pp. 53-54.

Plaintiff's new Employment Agreement was not prepared by the Defendant, and the siblings did not inform the Defendant's Human Resources Department that they were separately paying Plaintiff an additional $20,000 annual amount.  See Plaintiff's Exhibit 3; B. Darby Deposition, pp. 54-55. Wendy Kinsella, an HR employee at another of John Darby's companies, the Beach Company, knew about the new Employment Agreement, but the Defendant's HR Department and its Financial Director, Stephanie Clarkson, did not.  See Plaintiff's Exhibit 13, Email dated August 31, 2010 from Wendy Kinsella; Exhibit 14, Email dated August 31, 2010 from Dixie Norris; Norris Deposition, p. 10; Parker Deposition, p. 24. When Buddy Darby was asked at his deposition why the comptroller of the Defendant was not told of this additional compensation (which was paid directly to the Plaintiff from the siblings' personal accounts), Buddy Darby testified that "[t]he incentive fee was between my brother and three sisters." See B. Darby Deposition, p. 58.[5]

In May 2010, Plaintiff told Buddy Darby that she was expecting her second child. See Darby Affidavit, ¶ 5.  Buddy Darby had another baby shower for Plaintiff at Defendant's headquarters, approved payment for the shower, was the only male to attend the shower, and instructed that a gift be purchased for the Plaintiff. See Darby Affidavit, ¶ 6. However, Plaintiff was

_____

[5]In fact, Plaintiff's work for each of the five siblings was so confidential that, at least per instructions from one of the siblings, it was specifically not to be shared with not only the Defendant, but also with any of the other siblings.  See Plaintiff's Deposition, pp. 131-135.



told that this time she would not able to be paid while she was out on maternity leave beyond her accrued vacation and sick time. See B. Darby Deposition, pp. 80-81. Plaintiff had six weeks of accrued vacation and sick leave, and Buddy Darby testified that after Plaintiff was told she would not be paid beyond her accrued sick and vacation leave, she stated, "I guess I'll be back in six weeks." See B. Darby Deposition, p. 83; Plaintiff's Deposition, p. 248. There is no evidence that the incentive service fee came up during that conversation. See B. Darby Deposition, pp. 81, 136.

Plaintiff's office had always been situated in close proximity to Darby's office. However, in early June Buddy Darby told Plaintiff that her office may be moved to a building that housed the Defendant's accounting department. See Plaintiff's Deposition, p. 141. Plaintiff's office was thereafter moved on August 13, 2010 to the accounting department, which is in a building adjacent to her former office. See Plaintiff's Deposition, pp. 83-84, 119, 141. Although Plaintiff was not pleased about the move, she did not voice any objection to Darby. See Plaintiff's Deposition, pp. 109, 112. Plaintiff's new office was an enclosed, private space, with a door and a window, and was located adjacent to the Assistant Treasurer and former Corporate Comptroller, Stephanie Clarkson, and down the hall from the Chief Operating Officer, Townsend Clarkson.[6] See Norris Declaration, ¶ 11; Plaintiff's Deposition, pp. 109, 113-117. In her new office, Plaintiff was in the same area as some of the most senior and high level employees of the Defendant. See Plaintiff's Deposition, pp. 112-117.

Following this move, Plaintiff began having conflicts with Stephanie Clarkson. See Plaintiff's Deposition, pp. 281-283. Mrs. Clarkson told Plaintiff that she and Buddy Darby had

---

[6]The Clarksons are apparently married.

6



discussed Plaintiff reporting to her; however, Plaintiff testified that she and Buddy Darby had never discussed that possibility. See Plaintiff's Deposition, pp. 92-93. Plaintiff testified that she had always reported to Buddy Darby and did not ever report to Mrs. Clarkson. See Plaintiff's Deposition, p. 53. Plaintiff also testified that Mrs. Clarkson "added a level of stress and pressure" to "get things done" that Plaintiff had not experienced before, creating a "toxic environment." See Plaintiff's Deposition, pp. 281-284. Plaintiff considered Mrs. Clarkson to be unprofessional and gave as an example that Mrs. Clarkson entered her office without knocking and turned on the light. See Plaintiff's Deposition, pp. 85-92. Mrs. Clarkson told Plaintiff that there was a "Townsend policy" to keep the door open, to which Plaintiff responded that her work was of a highly sensitive and confidential nature and that she was not aware of a "Townsend policy" that would require her to keep her door open. Plaintiff testified that she had worked for the Defendant for years and had always kept her door closed. See Plaintiff's Deposition, p. 87. Plaintiff also testified that Mrs. Clarkson suggested that certain tasks had to be performed in case Plaintiff went "into pre-term labor," which Plaintiff found offensive. See Plaintiff's Deposition, pp. 89-92.

On August 16, 2010, Patrick Shelder, Director of Information Systems for the Defendant, obtained Plaintiff's laptop after she requested some technical assistance. See Shelder Affidavit, ¶ 3. Upon evaluating Plaintiff's laptop, Shelder discovered that none of her Word or Excel files were on her laptop. Concerned, he notified Mrs. Clarkson. See Shelder Affidavit, ¶ 4. Shelder also checked and discovered that Plaintiff's Word and Excel files were not stored on the Defendant's server. See Shelder Affidavit, ¶ 6. Shelder was concerned that Plaintiff was using flash drives to store her work files, and so advised Mrs. Clarkson, John Tugwell, the Defendant's Information Systems Manager, and Dixie Norris, the Director of Human Resources. See Shelder Affidavit, ¶ ¶



7 and 8; <u>see</u> <u>also</u> <u>Shelder Affidavit</u>, Exhibit 1.  Shelder emailed Plaintiff about not being able to find her files on her computer and inquired as to whether she had them.  Plaintiff responded in an email that she did, which Shelder forwarded to Mrs. Clarkson while expressing his relief by stating "Whoohoo."  <u>See</u> <u>Shelder Affidavit</u>, ¶ 9; <u>see</u> <u>also</u> <u>Shelder Affidavit</u>, Exhibit 2.  Shelder subsequently telephoned Plaintiff, and attests that she confirmed she had the Word and Excel files on flash drives. Shelder attests that he told Plaintiff to bring them in the next day and she agreed to do so.  <u>See</u> <u>Shelder Affidavit</u>, ¶ 10; <u>see</u> <u>also</u>, <u>Plaintiff's Deposition</u>, p. 309.  However, while Plaintiff testified she could not recall the specifics of her conversation with Shelder, she only "hoped" that her flash drives contained the information they needed.  <u>Plaintiff's Deposition</u>, pp. 311-313.

John Tugwell met with Plaintiff the next day, August 17, 2010, to retrieve her flash drives, but Plaintiff told him that she had left them at home.  <u>See</u> <u>Tugwell Affidavit</u>, ¶ 4.  Plaintiff testified that she also told Tugwell at that time that she only hoped her flash drives contained what the Defendant needed, but was not sure.  <u>Plaintiff's Deposition</u>, pp. 312-313.  Tugwell asked Plaintiff to bring her flash drives to the office the next day so he could back them up on the Defendant's server.  Plaintiff told Tugwell she would do so, but Tugwell attests that the next day Plaintiff again informed him that she had left the flash drives at home.  <u>See</u> <u>Tugwell Affidavit</u>, ¶ 5; <u>Plaintiff's Deposition</u>, p. 313.  Plaintiff testified that she could not recall whether she spoke to Tugwell that day, but that she had found the flash drives when she went home, looked at them, and that there were no documents on her flash drives.  <u>Plaintiff's Deposition</u>, pp. 318-319.  Tugwell attests that Plaintiff never told him that the flash drives did not contain work-related information.  <u>See</u> <u>Tugwell Affidavit</u>, ¶ 7; <u>see</u> <u>also</u> <u>Defendant's Exhibit M</u>.  Tugwell expressed his concerns about Plaintiff not returning the flash drives to Shelder and Norris on August 17th and again on August 18th.  <u>See</u> <u>Tugwell</u>



<u>Affidavit</u>, ¶ 6.  Mrs. Clarkson also sent Plaintiff an email on August 18, 2010, requesting that Plaintiff bring the information the following day, citing security reasons and the fact that Plaintiff could go out on maternity leave any day.  <u>See</u> <u>Defendant's Exhibit N</u>.

At approximately 9 p.m. that night, Plaintiff sent a message to Norris telling her that she would start her maternity leave the following day.  <u>See</u> <u>Defendant's Exhibit O</u>.  Jill Moss was to again cover for Plaintiff during her 2010 FMLA leave, with Jim Grant and Angela Watters being available to assist, if needed.  <u>See</u> <u>Plaintiff's Deposition</u>, p. 173.  On August 19, 2010, Mrs. Clarkson sent Plaintiff a list of questions from Moss and Grant regarding matters they needed to handle during her leave.  Mrs. Clarkson also again stressed the need to back up Plaintiff's word and excel files that she believed Plaintiff had with her, and offered to send John Weeks to her house at a convenient time the following day to pick them up.  <u>See</u> <u>Defendant's Exhibit P</u>.  Plaintiff testified that she did not recall seeing this email, and did not respond to it.  <u>Plaintiff's Deposition</u>, pp. 328-329.  When Clarkson did not receive a response from the Plaintiff, she also left her a voice message on August 20, 2010.

On August 23, 2010, Plaintiff's phone was shattered when it fell down her stairs as she rushed to get to the hospital around 1 a.m.  <u>See</u> <u>Plaintiff's Deposition</u>, p. 345.  On August 25, 2010, Norris wrote Plaintiff to request Plaintiff's keys to her locked filing cabinets, her external drive containing her electronic work files, any hard files she had, and her notebook containing her list of passwords.  <u>See</u> <u>Defendant's Exhibit R</u>.  Plaintiff was in the hospital between August 23 and August 30, 2010, so she did not receive Norris' letter until she came home from the hospital on approximately August 30, 2010.  <u>See</u> <u>Plaintiff's Deposition</u>, pp. 345-348.  Norris then spoke with the Plaintiff on August 30 and 31, 2010, and told her that she needed to return the notebook and flash

9



drives by the end of the week, which would have been September 3, 2010.  See Norris Affidavit, ¶ 16.  Additionally, Shelder attests that in late August 2010, he discovered that Plaintiff had deleted from her computer all e-mails and all files maintained in the inbox on the Defendant's email system for the period of August 31, 2007 through June 23, 2010.  See Shelder Affidavit, ¶ 19.  Plaintiff testified that she had deleted these emails pursuant to instructions from IT to clean up her computer and to allow for more storage.  See Plaintiff's Deposition, pp. 353-368, 371-372; Shelder Affidavit, ¶ 19.[7]  Norris kept Darby informed of all of these "problems."  See Norris Affidavit, ¶ 21.

It is undisputed that, before Plaintiff left to go out on maternity leave, Plaintiff wrote postdated checks for payments and bills that were going to be due during her maternity leave, including the checks for payment of her incentive fee.  See Plaintiff's Deposition, pp. 261, 265-266.  These checks had all been left for Moss so she could pay these bills when they came due, except for the checks for Plaintiff's own fee payments, which Plaintiff retained.  On August 30, 2010, Mrs. Clarkson wrote to Buddy Darby to inform him that Plaintiff had prepared post-dated checks for her incentive service fee, and to inquire as to whether these payments during the period of her maternity leave were part of a compensation package that he and his family had approved.  See Defendant's Exhibit S.  The following day, August 31, 2010, Buddy Darby left Dixie Norris a message that he wanted to terminate Plaintiff's employment.  See B. Darby Deposition, pp. 95-96.  Darby and Norris talked on September 1, 2010, and Darby agreed to wait until September 3, 2010, to see if Plaintiff returned the notebook and flash drive, and to see whether Plaintiff cashed  any of the incentive

---

[7]By September 2, 2010, Shelder was able to locate a copy of Plaintiff's emails from 11/22/2002 through 6/9/2010 on the Defendant's server.  See Defendant's Exhibit T.  Plaintiff's emails from 2002 through August 30, 2007 had also apparently been deleted at some point in the past, and those emails were also retrieved.



service fee checks that she had written to herself.  See <u>B. Darby Deposition</u>, pp. 95-6, 151-153; <u>Norris Deposition</u>, pp. 14-15.

Plaintiff testified that there was nothing on a flash drive for her to give them, while the notebook was returned by the Plaintiff's husband, although not until a few days after September 3rd.  See <u>Norris Declaration</u>, ¶ 28; <u>see also</u> <u>Plaintiff's Deposition</u>, pp. 354-358.  Plaintiff did cash one of the September postdated incentive service fee checks.  See <u>Norris Affidavit</u>, ¶ 24.[8]  Buddy Darby states that he "considered [Plaintiff's] conduct in regard to her failure to return the notebook, her failure to return the flash drives, and her writing sixteen post-dated checks for incentive compensation to be insubordinate and violative of [Defendant's] policies."  See <u>Darby Affidavit</u>, ¶ 12.  Buddy Darby further attests that "[a]s a result of [Plaintiff's] conduct described above, which included deleting all her e-mails for a lengthy period of time, I lost trust and confidence necessary for me to have someone who held such a highly sensitive and trusted position.  Accordingly, I made the final decision to terminate [Plaintiff's] employment.  I made the final decision, in consultation with Ms. Norris, after [Plaintiff] did not return the notebook or the flash drives on September 3, 2010, and she cashed one of the checks."  See <u>Darby Affidavit</u>, ¶ 13.

### Discussion

In this lawsuit, Plaintiff claims the Defendant denied and interfered with benefits she was entitled to under the FMLA (first cause of action), and retaliated against her for exercising her rights under the FMLA (second cause of action).  Defendant seeks summary judgment on both of

---

[8]The Defendant had apparently placed a "stop payment" order on all but one of these checks, including the other checks for September, but had left one check open to see if Plaintiff cashed it.  It is not clear whose account the one cashed check came from.  It also appears the Defendant later learned a second check had also cleared.  See <u>Norris Affidavit</u>, ¶ 24.



Plaintiff's claims.  Summary judgment "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that judgment

on the pleadings is appropriate.  Once the moving party makes this showing, however, to survive

summary judgment the opposing party must respond to the motion with "specific facts showing there

is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

### Family and Medical Leave Act

The Family and Medical Leave Act provides that covered employees are entitled to

a total of twelve (12) work weeks of leave during any twelve (12) month period for family and health

related matters, as well as a right to be restored to the position of employment held by the employee

when the leave commenced, or to an equivalent position. 29 U.S.C. §§ 2612, 2614.  The FMLA also

protects employees from discrimination or retaliation for exercising their rights under that statute.

29 U.S.C. § 2615(a)(1) and (2).  Stated another way,

> [t]he FMLA creates two types of claims: (1) interference claims, in which an
> employee asserts that his employer denied or otherwise interfered with his substantive
> rights under the Act; and (2) retaliation claims, in which an employee asserts that his
> employer discriminated against him because he engaged in activity protected by the
> Act.

Carr v. Mike Reichenbach Ford Lincoln, Inc., No. 11-2240, 2013 WL 1282105 at *6 (D.S.C. Mar.

26, 2013)(quoting Gleaton v. Monumental Life Ins. Co., 719 F.Supp.2d 623, 633, n. 3 (D.S.C.

2010)); Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3rd Cir. 2006).

Defendant does not dispute for purposes of summary judgment that it meets the

criteria for being an "employer" under the Act,  and that Plaintiff was a covered employee entitled



to FMLA leave. Defendant does contest, however, that it ever denied Plaintiff FMLA benefits to

which she was entitled, or otherwise interfered with her FMLA rights or retaliated against her for

exercising those rights.

### Interference Claim

Plaintiff alleges in her First Cause of Action that the Defendant interfered with her

rights under the FMLA when it refused to pay her incentive service fee while she was out on FMLA

leave, and then terminated her and failed to restore her to her employment.[9]  "To establish unlawful

interference with an entitlement to FMLA benefits, an employee must show that:  (1) [s]he was an

eligible employee, (2) [her] employer was covered by the Act, (3) [s]he was entitled to leave under

---

[9]It could be argued that Plaintiff's claim that the Defendant refused to pay her the incentive
fee and terminated her because she exercised her leave rights under the FMLA sets up a classic
retaliation scenario, and that Plaintiff's "interference" claim should therefore be dismissed, with her
claim instead being evaluated solely under her "retaliation" cause of action.  However, the caselaw
appears to allow both an interference and a retaliation claim to go forward based on the facts
presented.  Cf. Reid v. Smithkline Beecham Corporation, 366 F.Supp.2d 989, 998 (S.D.Cal. 2005)
[holding that claim that employee was terminated as a result of requesting and taking FMLA
protected leave was properly analyzed as an interference cause of action]; Miller v. Pilgram's Pride
Corporation, No. 5-05-cv-64, 2007 WL 2007548, * 8 (W.D.Va. July 6, 2007) [holding that taking
FMLA leave can be a protected activity sufficient to establish an FMLA retaliation claim];
Blankenship v. Buchanan General Hosp., 140 F.Supp.2d 668, 672 (W.D.Va. 2001) ["[T]he courts
have recognized that the FMLA also provides a cause of action for retaliatory discharge for receiving
FMLA leave."].  However, the framework for analyzing interference and retaliation claims under the
FMLA is different.  While, to establish a retaliation claim, a Plaintiff must proceed (absent direct
evidence) through the framework for analyzing retaliation claims under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e, et. seq.; see Dodgens v. Kent Manufacturing Company, 955 F.Supp.
560, 565-566 (D.S.C. 1997); see also discussion of FMLA retaliation claim, infra; to proceed with
her interference claim, Plaintiff need only prove by a preponderance of the evidence that her taking
of FMLA protected leave "constituted a negative factor in the decision to terminate her." Reid, 366
F.Supp.2d at 998.  "'[A]n interference action is not about discrimination, it is only about whether the
employer provided the employee with the entitlements guaranteed by the FMLA.'" Sommer, 461
F.3d at 399 (quoting  Callison v. City of Philadelphia, 430 F.3d 117, 120 (3rd Cir. 2005)); Wysong
v. Dow Chem. Co., 503 F.3d 441, 446 (6th Cir. 2007).  Therefore, the undersigned has analyzed
Plaintiff's claim using both the "interference" and retaliation" framework.



the FMLA, (4) [s]he gave [her] employer adequate notice of [her] intention to take leave, and (5) the employer denied [her] FMLA benefits to which [s]he was entitled."  Carr, 2013 WL 1282105 at * 7 (quoting King v. Blanchard Mach. Co., No. 10-3219, 2012 WL 4586177 at * 5 (D.S.C. Sept. 28, 2012)); Makowski v. Smithamundsen LLC, 662 F.3d 818, 825 (7th Cir. 2011); see Taylor v. Progress Energy, Inc., 493 F.3d 454, 457 (4th Cir. 2007)[Under the FMLA, an employee has a "right to take a certain amount of unpaid medical leave each year and the right to reinstatement following such leave."].

Defendant does not dispute that Plaintiff satisfies the first four elements of an FMLA interference claim.  However, Defendant argues that Plaintiff was terminated for inappropriate conduct that was not related to Plaintiff's FMLA leave, including paying herself her incentive service fee to which she was not entitled while she was on FMLA leave.  See Laing v. Federal Express Corp., 703 F.3d 713, 723 (4th Cir. 2013)["FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave."](quoting Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 549 (4th. 2006)); Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 959 (8th Cir. 2012)[Fact that Plaintiff took FMLA leave does not insulate an employee from termination for reasons unrelated to the taking of her FMLA leave].

A review of the evidence establishes that Plaintiff's contract provided, in addition to her base compensation, that Plaintiff would receive an additional "annual service fee" of $20,000, seventy-five percent of which would be payable in monthly installments of $1,467.96.  Payment of this fee was contingent on Plaintiff rendering "satisfactory performance" and being "actively employed in good standing at the time of payment(s)."  See Plaintiff's Exhibit 5.  The parties also do not dispute that this fee was paid prospectively on the first of every month, as both counsel

14



represented to the Court at the hearing that Plaintiff's payments for the incentive service fee were made on a prospective basis. Therefore, Plaintiff's August 1 checks for this fee represented payment for the month of August, and the September checks would have been for the month of September, when Plaintiff was on FMLA leave. Before Plaintiff left to go out on maternity leave, she wrote her incentive fee checks (except for one of the siblings, who wrote her own incentive fee checks), as well as all the other checks needed for payment of the siblings' bills for the period of time when she was going to be out on maternity leave, and left these checks for Moss to have (which is also what she did during her 2008 maternity leave), except that she kept the checks made out to herself. <u>See Plaintiff's Deposition</u>, pp. 261, 265-266. The evidence before the Court, considered in the light most favorable to the Plaintiff, shows that Plaintiff was then terminated, at least in part, because she had written herself the checks for her incentive service fee and then cashed one of the September payment checks on or about September 1, while she was on FMLA leave.

Defendant contends that these actions were improper because Plaintiff was not entitled to the one payment she cashed while she was on FMLA leave,[10] and because she wrote herself the other checks which were dated for the period of her leave. However, there is no dispute that Plaintiff had been given the authority to both write and cash the checks for her incentive service fee. There is also no dispute that when Plaintiff previously was on maternity leave in 2008 she wrote the checks Moss would need ahead of time. <u>See</u> <u>Plaintiff's Deposition</u>, pp. 260-261. Therefore, if there is a question of fact as to whether Plaintiff was entitled to this payment, and the Defendant waited for her to cash the check(s) and then terminated her for doing so because she was out on FMLA leave, the

---

[10]As previously noted, it appears that there may have been a second check that cleared as well. <u>See</u> <u>Norris Affidavit</u>, ¶ 24.



Defendant is not entitled to summary judgment on Plaintiff's interference claim. See 29 U.S.C. § 2614(a)(2) ["The taking of leave [under the FMLA] shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced."]; Wysong, 503 F.3d at 447 ["If an employer takes an employment action based, *in whole or in part*, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."](emphasis added); Liu v. Amway Corp., 347 F.3d 1125, 1135 (9th Cir. 2003) ["[W]here an employee is subjected to negative consequences simply because he has used FMLA leave, the employer has interfered with the employee's FMLA leave rights"].

Here, Plaintiff's employment contract refers to these payments as an "incentive service fee", which was "contingent upon satisfactory performance and [Plaintiff being] actively employed in good standing at the time of payment(s)." See Defendant's Exhibit F. For purposes of its motion, Defendant has made no argument that Plaintiff was not entitled to payment of this fee because her performance was not satisfactory. Rather, Defendant argues that Plaintiff was not entitled to receive this fee because she was out on maternity leave. See Darby Affidavit, ¶ 10. Further, while there is some evidence in the record to indicate that, at least at some point, whether Plaintiff met the definition of being "actively employed" while out on maternity leave might be an issue,[11] Defendant now concedes that whether or not Plaintiff met the criteria for being "actively

---

[11]Plaintiff has submitted an email from Norris to Stephanie Clarkson wherein Norris referred to the Plaintiff's employment contract, and stating "[i]t does say she must be 'actively employed' to receive the compensation, which we can use to say she should not be getting these additional checks while on leave." See Plaintiff's Exhibit 17 [Bates No. KDP 0436]. Although Defendant has argued that this email, which it produced to Plaintiff in discovery, should not be considered, the Court finds that the proper objection and showing has not been made to exclude this evidence under Rule 56(c), Fed.R.Civ.P. for purposes of this motion at this time. See Nana-Akua Takyiwaa Shalom v. Payless Shoe Source Worldwide, Inc., ___ F.Supp.2d ___, 2013 WL 451640 n. 2 (D.Md. Feb. 5, 2013);
(continued...)



employed" when she was out on maternity leave was not a factor in determining whether Plaintiff

was entitled to her incentive service fee. <u>See</u> <u>Defendant's Reply</u>, p. 5. Instead, Defendant argues that

a separate section of Plaintiff's contract, entitled "Miscellaneous Benefits", controls. This section

provides, in part, that "[a]ll benefits, including but not limited to, health insurance, dental insurance,

401k, disability insurance, paid vacation, paid sick time, remain unchanged and unaffected by this

agreement . . . ." <u>See</u> <u>Defendant's Exhibit F</u>. Defendant argues that, pursuant to this clause, Plaintiff

was only entitled to her accrued sick and annual leave while out on maternity leave, and that she was

not entitled to continue to receive her incentive fee payment, which Defendant likens to a bonus. <u>See</u>

Defendant's Memorandum in Support of Summary Judgment, pp. 6-7, citing to Defendant's policies.


Defendant's policy on vacation benefits [402] states,

> Vacation time off is paid at the employee's base pay rate at the time of vacation. It
> does not include overtime or any special forms of compensation such as incentives,
> commissions, bonuses, gratuities, or shift differentials.

<u>See</u> <u>Norris Affidavit Exhibit 2</u> [Bates Number KDP 0113]. Defendant's policy on sick leave benefits

[403] states,

> Sick leave benefits will be calculated based on the employee's base pay rate at the
> time of absence and will not include any special forms of compensations, such as
> incentives, commissions, bonuses, or shift differentials.

<u>See</u> <u>Norris Affidavit Exhibit 2</u> [Bates Number KDP 0116]. The record shows that on August 9, 2010,

Norris notified Plaintiff that she had a total of approximately three hundred and thirty-three (333)

hours of accrued paid and sick leave to use while she was on FMLA leave. <u>See</u> <u>Plaintiff's</u>

---

[11](...continued)
<u>Richardson v. Mississippi Dep't of Human Servs.</u>, No. 10-198, 2012 WL 568285 (S.D.Miss. Feb.
21, 2012).



Deposition, pp. 255-256; <u>Norris Affidavit</u>, ¶ 9 and <u>Norris Affidavit Exhibit 4</u>.  Plaintiff had approximately eight (8) to nine (9) weeks of sick time and annual leave when she went on FMLA leave on August 19, 2010.  <u>See</u> <u>Norris Affidavit</u>, ¶ 10.

   However, nothing in this evidence conclusively establishes that Plaintiff was not entitled to continued payment of the separate incentive fee portion of her contract while out on maternity leave.  There is no evidence that the reason the Defendant chose to withhold this payment was due to unsatisfactory work performance, nor does the Defendant contend Plaintiff was not "actively employed" during this period.  Those are the only two criteria set forth in the contract for Plaintiff to meet to be entitled to payment of this money.  Further, since the Darby siblings purposely kept knowledge of Plaintiff's incentive service fee from Norris, her conversations with Plaintiff regarding the leave benefits Plaintiff was entitled to during her FMLA leave shed very little light, if any, on the issue of Plaintiff's entitlement to her separate incentive service fee.  Notably, the Defendant never claimed that Plaintiff was not entitled to the full amounts of her August checks for her incentive service fee, even though she only worked through August 18, 2010 before going out on maternity leave.  There is no evidence (and indeed the Defendant has not even argued) that Plaintiff was ever told that she needed to prorate her August payment or return any portion of that payment, despite Defendant's numerous oral and written correspondence with Plaintiff during this time period.

   Further, Plaintiff notes that when she was previously out of the office on vacation or out sick during 2010, that she had continued to receive her incentive service pay.  Defendant cannot treat Plaintiff's FMLA leave differently from any other leave for purposes of calculating her incentive fee payment.  <u>Liu</u>, 347 F.3d at 1135 ["[W]here an employee is subjected to negative



consequences simply because he has used FMLA leave, the employer has interfered with the employee's FMLA leave rights"]; <u>cf</u>. <u>PPG Industries, Inc. v. International Chemical Workers Union</u>, 587 F.3d 648, 650 (4th Cir. 2007)[Where it was specifically stated in contract that "actively employed" included employees on FMLA and military leave, but not on other types of leave.] Although Defendant argues in its reply memorandum that Plaintiff "may have missed a few days of work for unreported vacation or sickness" during which she was paid her incentive payment, "she was never on vacation or sick leave status at KDP in 2010, [and] KDP never treated her as being on such leave"[12], Plaintiff submitted three documents at the hearing which were produced by the Defendant to the Plaintiff in discovery, and which reflect that Plaintiff was out on vacation and/or sick leave April 8 through April 9, 2010 [Bates No. KDP 638], April 12 through April 13, 2010 [Bates No. KDP 639], and June 1 through June 4, 2010 [Bates No. KDP 642].[13] <u>See</u> Court Docket No. 60, pp. 1-3. Again, it is undisputed that Plaintiff's incentive service fee was paid in full during these time periods. <u>Carr</u>, 2013 WL 1282105, at * 7 [Interference claim established where employer denied employee benefits to which they were entitled while out on FMLA leave].

       Even if, as Defendant contends, this payment should be classified as a bonus, bonuses are covered under the broad scope of the FMLA. <u>Estes v. Meridian One Corp.</u>, 6 Fed.Appx. 142, 145-146 (4th Cir. 2001); <u>Dierlam v. Wesley Jessen Corp.</u>, 222 F.Supp.2d 1052, 1056 (N.D.Ill. Sept. 23, 2002). The Department of Labor distinguishes between the types of bonuses covered under the FMLA, categorizing them as a performance type bonus or an attendance type bonus.

       Bonuses for perfect attendance and safety do not require performance by the

---

[12]<u>See</u> Defendant's Reply Memorandum, p. 2.

[13]See also, n. 10 regarding Defendant's objections to the consideration of this evidence.



employee but rather contemplate the absence of occurrences . . . A monthly production bonus, on the other hand does require performance by the employee. If the employee is on FMLA leave during any part of the period for which the bonus is computed, the employee is entitled to the same consideration for the bonus as other employees on paid or unpaid leave (as appropriate). See paragraph (d)(2) of this section.

29 C.F.R. § 825.215(c)(2). See also DOL Op. Ltr., FMLA-110, 2000 WL 33157364 (Sept. 11, 2000).

See also Sommer, 461 F.3d at 399-400; Dierlam, 222 F.Supp.2d at 1056. The Fourth Circuit held

in Estes, in deciding whether an employee could recover commissions earned prior to and during

FMLA leave, that "'[i]f the employee is on FMLA leave during any part of the period of for the

which the bonus is computed, the employee is entitled to the same consideration for the bonus as

other employees on paid or unpaid leave.'" Id. at 145-146. As previously noted, Plaintiff had

received payment of this money while out on paid vacation and sick leave. In any event, even if this

payment is not considered to be salary, but a "bonus", it more closely resembles a type of attendance

bonus than a production bonus. See Dierlam, 222 F.Supp.2d at 1054 [Where the Court found a bonus

which provided that "if [plaintiff] remained 'actively employed' by [defendant] . . . , she was entitled

to a one-time bonus . . . " was a type of attendance bonus and could not be prorated for the time in

which plaintiff was absent due to her FMLA leave]; see also Caldwell v. Building Plastics, Inc., No.

07-2242, 2009 WL 2749964 at *5 (W.D.Tenn. Aug. 26, 2009)[Finding that where a bonus depended

on two things, employee performance and company profitability, and did not require the employees

to accomplish any specific goal in order to be entitled to them, that "[t]his [was] not the type of bonus

that may be reduced by the taking of FMLA leave."]; Sommer, 461 F.3d at 400 ["[E]mployee may

not be disqualified for . . . bonus(es) for the taking of FMLA leave"].

　　　　　Considered in the light most favorable to the Plaintiff, this evidence is sufficient to

create a genuine issue of fact as to whether the Defendant's decision to deny Plaintiff her incentive



fee while she was out on maternity leave, and to terminate her employment because she cashed one of her incentive fee checks and also, at least in part, because she had even written herself those checks, was a violation of the FMLA to survive summary judgment.  <u>Wysong</u>, 503 F.3d at 447 ["If an employer takes an employment action based, *in whole or in part*, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."](emphasis added); <u>Liu</u>, 347 F.3d at 1135 ["[W]here an employee is subjected to negative consequences simply because he has used FMLA leave, the employer has interfered with the employee's FMLA leave rights"]; <u>Estes</u>, 6 Fed.Appx. At 145-146.  Therefore, Defendant's motion for summary judgment with regard to Plaintiff's FMLA interference claim should be denied. <u>Muhammad v. Klotz</u>, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law'"], citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-252 (1986).

### FMLA retaliation claim

The FMLA guarantees Plaintiff the right not to be discriminated or retaliated against for exercising her substantive FMLA rights.  29 U.S.C. §§ 2615(a)(2), 2615(b); <u>Taylor</u>, 493 F.3d at 457.  In her Second Cause of Action, Plaintiff alleges that the Defendant retaliated against her for taking FMLA leave by refusing to pay her money she was owed and by terminating her while she was on protected FMLA leave "based on false accusations that it knew or should have known to be false."

As previously noted, a retaliation claim under the FMLA is analyzed under the same



standards as are applied to a Title VII retaliation claim.  See Laing, 703 F.3d at 718-719; Dodgens,

955 F.Supp. at 565-566 [appropriate analysis for retaliatory discharge under FMLA is that provided

for Title VII for retaliatory discharge].[14]  Pursuant to this standard, "[t]he employee is initially

required to establish a prima facie case of retaliation by a preponderance of the evidence.  Such a

prima facie case consists of three elements:  (1) the employee engaged in protected activity; (2) the

employer took adverse employment action against the employee; and (3) a causal connection existed

between the protected activity and the adverse action." Williams v. Cerberonics, Inc., 871 F.2d 452,

457 (4th Cir. 1989); Munday  v. Waste Management of North America, Inc., 126 F.3d 239, 242 (4th

Cir. 1997); Blankenship, 140 F.Supp.2d at 674.  Once a prima facie case has been presented, the

Defendant employer has the burden of producing a legitimate, non-discriminatory reason for its

actions.  If the employer can produce a legitimate, non-discriminatory reason for its actions, the

employee must demonstrate that the Defendant's proffered reason is pretextural. Id. ; Nichols v.

Ashland Hospital Corporation, 251 F.3d 496, 502 (4th Cir. 2001).

It is undisputed that Plaintiff engaged in protected activity by exercising her rights

under the FMLA, and that the Defendant took adverse action against her when it refused to pay her

incentive service fee and terminated Plaintiff from her job.  Therefore, the first two (2) prongs of the

retaliation prima facie case are met.  With respect to whether there is evidence of a causal connection

between these events, it is undisputed that the reason Plaintiff was denied her incentive fee payment

---

[14]This would apparently include claims that an employer fired an employee for taking FMLA
leave, even though that would seem to be the same claim just discussed as an "interference" claim.
Blankenship, 140 F.Supp.2d at 672 ["E]mployers cannot use the taking of FMLA leave as a negative
factor in employment actions, such as hiring, promotions, or disciplinary actions....Based on this, the
courts have recognized that the FMLA also provides a cause of action for retaliatory discharge for
receiving FMLA leave."] (internal citations omitted).



was because she was out on FMLA leave, and the evidence further shows that the Defendant terminated the Plaintiff's employment, at least in part, for cashing one of her incentive service fee checks for the month of September, and for even having written these checks. These facts clearly establish a causal connection between Plaintiff's protected activity and the cited adverse employment actions. Cf. Turner v. McKesson Corp., No. 12-2053, 2012 WL 3542240 at * 6 (N.D.Ala. Aug. 10, 2012)["Although the Complaint contains a number of alleged acts that purport to show indirect evidence of defendant's retaliation against plaintiff, the court need not look any further than plaintiff's statement that her merit adjustment was prorated to a lower rate 'directly as a result' of her taking FMLA leave."] [Motion to Dismiss]. In any event, under the facts presented, the close "temporal proximity" between Plaintiff's protected activity and the adverse employment action is itself sufficient to establish this third prong of Plaintiff's prima facie case. See See Laing, 703 F.3d at 720; Heady v. US Enrichment Corp., 146 Fed.Appx. 766, 770-771 (6th Cir. 2005) ["[T]emporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation in violation of the FMLA...."]; see also Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago, 104 F.3d 1004, 1013 (7th Cir. 1997)[noting that "suspicious timing does constitute circumstantial . . . evidence to support a claim of discrimination"]; Gordon v. Southern Bells, Inc., 67 F.Supp.2d 966, 988 (S.D.Ind. 1999)["A short time span between protected activity and an adverse employment action may be sufficient to prove a causal connection between the two events. . . . A close temporal connection between the two events is generally enough to satisfy the third element of the prima facie case."]; Jones v. City of Elizabeth City, North Carolina, 840 F.Supp. 398, 403 (E.D.N.C. 1996), aff'd., 2 F.3d 1149 (4th Cir. 1993). Therefore, at least for purposes of summary judgment, the evidence is sufficient to establish Plaintiff's retaliation prima facie case.



<u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981) [the burden of establishing a prima facie case is not onerous].

   With respect to whether the Defendant had a legitimate, non-discriminating reason for its actions, the Defendant has presented evidence to show that, in addition to its contention that Plaintiff was not entitled to receive her incentive pay during the time period of her leave, Plaintiff was terminated due to Plaintiff deleting three years of emails shortly prior to her leave, its concerns about Plaintiff maintaining and not returning a notebook containing highly confidential financial information, concerns about why Plaintiff's computer had no documents on it and why such documents were never backed up on its server, and questions concerning discrepancies about whether Plaintiff had flash drives with highly confidential financial information that had not been returned to the Defendant. This evidence is sufficient for the Defendant to meet its burden of production to show a legitimate, non-discriminatory reason for its actions. See <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936, 941 (4th Cir. 1991) [The Defendant's burden is only one of production, not of persuasion]; See <u>Laing</u>, 703 F.3d at 721. Therefore, the Court must turn to the issue of whether sufficient evidence of pretext has been presented for Plaintiff to survive summary judgment on this claim.

   In order to show pretext, Plaintiff must show that "but for" the Defendant's intent to retaliate against her because she exercised her leave rights under the FMLA, she would not have suffered the adverse job actions at issue. <u>EEOC</u>, 955 F.2d at 941; <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 234 (4th Cir. 1991). Discerning an employer's motives in a case like this is always difficult, as it is the rare employer who is so unwise as to make incriminating statements concerning its motivation so as to provide a plaintiff with concrete evidence to support their claim. Thus, the law provides that evidence derived from circumstances and inferences may be used to

24



support a claim. <u>LeBlanc v. Great American Insurance Co.</u>, 6 F.3d 836, 843 (1st Cir. 1993) ["Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole... must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [retaliatory animus].'"](citing <u>Goldman v. First Nat'l Bank</u>, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991), <u>cert. denied</u>, 111 S.Ct. 2828 (1991)); <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 141-143 (2000).

Pursuant to the evidence previously discussed, <u>supra</u>, in the light most favorable to the Plaintiff, the undersigned concludes that Plaintiff has produced sufficient evidence to create an issue of fact as to whether retaliation occurred in this case.  The evidence shows that in both 2008 and 2010 Plaintiff wrote out all the checks Moss would need in advance prior to leaving on maternity leave, with the only difference being that in 2010 these checks included Plaintiff's incentive fee payment (which she did not receive in 2008).  Darby instructed Norris to fire Plaintiff immediately after his receipt of the communication from Mrs. Clarkson about Plaintiff having written herself checks for her service fee, and then the Defendant specifically waited for Plaintiff to cash one of these checks, which it then used as a reason to fire her specifically because she was out on maternity leave when she did so, even though there is a legitimate issue of fact as to whether she was entitled to do so under her contract. <u>Carr</u>, 2013 WL 1282105, at * 6 [FMLA retaliation claim established where evidence shows that employer discriminated against employee because they were out on FMLA leave].

Considered in the light most favorable to the Plaintiff, this evidence is sufficient proof of retaliation to survive summary judgment.  <u>Mascioli v. Arby's Restaurant Group, Inc.</u>, 610 F.Supp.2d 419, 433 (W.D.Pa. 2008)["To prove FMLA retaliation, an employee must show that [her]

25



employer intentionally discriminated against [her] for exercising an FMLA right."] (quoting <u>Martin v. Brevard County Sch.</u>, 543 F.3d 1261, 1267 (11th Cir. 2008)); <u>see</u> <u>LeBlanc</u>, 6 F.3d at 843 ["direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole...must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [retaliatory animus]'"]; <u>Reeves</u>, 530 U.S. at 141-143 [setting forth the general proposition that where a plaintiff presents a prima facie case together with sufficient evidence to conclude that the employer's asserted justification for the employment decision is false, a trier of fact can conclude that the employer unlawfully discriminated]; <u>Anderson</u>, 477 U.S. at 255 [at summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"]; <u>cf.</u> <u>Wysong</u>, 503 F.3d at 447["If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."] (interference case).  Therefore, Defendant's motion for summary judgment with regard to Plaintiff's FMLA retaliation claim should be denied.

<div align="center">

**<u>Conclusion</u>**

</div>

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **denied**.

 

 

<div align="center" style="margin-left:40%">

_____
Bristow Marchant
United States Magistrate Judge

</div>

May 20, 2013
Charleston, South Carolina

<div align="center">26</div>



### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

<div align="center">

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

</div>

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

